IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:09-cr-00008 |
| v. | MEMORANDUM OPINION |
| PAMELA KAY DIVINE, *Defendant.* | JUDGE NORMAN K. MOON |

This matter is before the Court upon the Government's request that Defendant Pamela Kay Divine be ordered to pay the Virginia Department of Medical Assistance Services (hereinafter "DMAS") restitution in the amount of $130,157. At the sentencing hearing on January 11, 2010, the Court ordered the matter of restitution deferred for up to 90 days, and directed the parties to submit briefing on the issue. On February 8, 2010, the Government submitted its Memorandum in Support of an Order of Restitution (docket no. 64), on April 7, Defendant filed her Opposition thereto (docket no. 68), and the Court heard argument on the issue of restitution on April 12. After full consideration of the arguments presented by the parties, for the reasons set forth below, the Court will DENY the Government's request for restitution, in an accompanying Order, to follow.

I. BACKGROUND

Advantage Care was a business that provided home care services and respite care services to Medicaid recipients, and which had offices in Staunton, Covington, Culpeper, Harrisonburg, and Charlottesville, Virginia.[1] This business was solely owned by John Divine, who was Defendant's

---

[1] Unless otherwise noted, the facts set forth herein are drawn from the Statement of Facts agreed upon by the Government and Defendant, filed September 28, 2009 (docket no. 49).

husband at all times relevant to the conduct at issue in these proceedings. Defendant was employed as Advantage Care's Regional Administrator, in which role she ran the daily operations of the business, including hiring and managing its workforce.

For its home care services, Advantage Care employed Personal Care Aides (hereinafter "PCAs") to provide basic health-related services, including assisting with daily living activities, ambulation and exercises, and other household services for the Medicaid recipient, so they could remain in their home. Advantage Care was registered as a provider with DMAS, which is the state agency responsible for administering the Virginia Medicaid Program and reimbursing claims for services rendered by the PCAs. Advantage Care entered into several contractual agreements with DMAS for the provision of health-related services by PCAs (docket no. 65, ex. 2). As one term of such agreements, Advantage Care agreed to "comply with all applicable state and federal laws, as well as administrative policies and procedures of DMAS as from time to time amended." *Id.* at ¶ 8.

The parties agree that one such term for reimbursement from DMAS is that the PCA must be properly trained. Specifically, the PCA must have completed a 40-hour training program using a Medicaid-approved curriculum prior to receiving a PCA Certificate, which then must be signed by a Registered Nurse. Medicaid rules prohibit the reimbursement for services rendered by untrained PCAs. As a home care provider registered and approved by Medicaid, Advantage Care trained its PCAs "in house" using the Medicaid-approved curriculum, as it was permitted to do.

However, in 2004, the Virginia Department of Health Professions (hereinafter "DHP") received an anonymous complaint that the PCAs at Advantage Care were provided their Certificates without the mandatory 40 hours of training. No adverse action was taken in the ensuing investigation as, in part, Defendant represented that she personally audited Advantage Care records. Again in October, 2005, another complaint was filed (this time with DMAS) about Advantage Care issuing

PCA Certificates to individuals without the necessary training. In response to the DMAS complaint, Co-Defendant Linda Utley McCrae (hereinafter "McCrae"), a Registered Nurse employed with Advantage Care, was directed to conduct the 40-hour training course for all untrained PCAs. Although this course did not meet the requirements of the Medicaid approved curriculum, PCA Certificates were issued to the attendees. As a result of the October 2005 DMAS complaint, DHP launched an investigation of another Registered Nurse with Advantage Care (identified as "MH" in the Statement of Facts). When Defendant was interviewed by a DHP investigator regarding the conduct of MH, Defendant protected MH and blamed the improper issuance of PCA Certificates on an administrative assistant, who was subsequently fired.

In fact, as early as 2004, it had been the practice at Advantage Care at the direction of its management to issue PCA Certificates to persons with prior medical experience, after taking a test. "Testing out" was not an approved way of obtaining a PCA Certificate, as the Medicaid regulations required the 40-hour training course. As a consequence of this improper certification process, between January of 2004 and October of 2005, six untrained and uncertified PCAs in Harrisonburg provided personal health care services to Medicaid recipients, for which Advantage Care submitted, and was reimbursed for, claims in excess of $120,000.00.[2]

Defendant's plea agreement contains the following provisions with respect to the issue of restitution:

---

[2] The Government and the Defendant agreed upon the fact that six untrained and uncertified PCAs were employed by Advantage Care in Harrisonburg, and submitted claims "in excess of $120,000." *See* Statement of Facts, at 3. In its Memorandum in Support of Restitution, the Government later sought restitution for amounts Advantage Care billed for the services of ten of its employees, for an amount totaling $130,157.00 (docket no. 65, ex. 1). While Defendant has objected to the Court's "acceptance or consideration of any alleged 'facts' beyond the stipulated statement of facts," it does not appear these new figures are in dispute, as Defendant states that "[t]hose PCA's and the hours billed and paid prior to receiving appropriate training are correctly detailed on Attachment 1 to the Government's memorandum." Memorandum in Opposition to Government's Position on the Issue of Restitution, at 1-2 (docket no. 68).

> I understand restitution may be ordered, my assets may be subject to forfeiture, and fees may be imposed to pay for incarceration and supervised release.
>
> . . .
>
> I understand that, pursuant to 18 U.S.C. §§ 3663 and/or 3663A and given the fact that the amount of loss used to calculate the Sentencing Guidelines Base level is conservatively calculated, I may be required to pay restitution for the entire scope of my criminal conduct, including, but not limited to, all matters deemed as relevant conduct. However, I further understand that the Untied States will provide to the Court and recommend that I pay restitution to Medicaid for the loss caused by billing untrained Personal Care Aides at the Harrisonburg, Virginia office in 2004 and 2005. As such, I agree to make good faith efforts toward payment of all mandatory assessments, restitution and fines, with whatever means I have at my disposal. I agree failure to do so will constitute a violation of this agreement. I will execute any documents necessary to release the funds I have in any repository, bank, investment, other financial institution, or any other location in order to make partial or total payment toward the mandatory assessments, restitution and fines imposed in my case.

Plea Agreement, at 1, 4 (docket no. 51).

The Government now seeks restitution in the amount of $130,157.00. It does so on the grounds that "18 U.S.C. § 3663A(c)(1)(A)(ii) requires the award of restitution for any offense committed by fraud or deceit that results in a conviction," and that Defendant "pleaded guilty to one count of Conspiracy, in violation of 18 U.S.C. § 371[Conspiracy to commit offense or to defraud United States], thereby admitting that she had committed health care fraud or defrauded the United States." Government's Memorandum in Support, at 4. The Government argues that Advantage Care had agreed, in its Provider's Contract with DMAS, only to bill for the services of those PCAs that had received the requisite training. *Id.* at 5. Because Defendant submitted claims for the services of PCAs who had not received the required training in the amount of $130,157.00, and because DMAS

would not have reimbursed for these claims if it had known the services rendered were provided by untrained individuals, the Government seeks this sum in restitution. *Id.* at 6.

In response, Defendant argues that "[t]he Government has never contested that these PCA's actually provided care for all of the hours billed and paid," nor has it ever "contended that any of these PCA's provided inadequate or substandard care." Defendant's Memorandum in Opposition, at 2. Defendant admits that the practice of Advantage Care of failing to properly train PCAs may have been in violation of its Provider's Contract, but she argues that the Government has not produced evidence that it suffered an actual loss as a result. *Id.* at 3.

## II. APPLICABLE LAW

Federal courts do not possess any inherent power to enter an award of restitution, and may only do so as expressly authorized by statute. *See United States v. Cohen*, 459 F.3d 490, 498 (4th Cir. 2006) (citing *United States v. Broughton-Jones*, 71 F.3d 1143, 1149 (4th Cir. 1995)); *United States v. Davold Real Estate P'ship*, No. 5:01-cr-30064, 2004 WL 1242733, at *2 (W.D. Va. May 20, 2004). There are two general restitution statutes that govern the award of restitution in the vast majority of criminal cases. The first is the Victim and Witness Protection Act (hereinafter "VWPA"), which provides that "when sentencing a defendant convicted of an offense under [Title 18]," the Court may order that the defendant make restitution to any victim of such offense, *i.e.*, "a person directly and proximately harmed" as a result thereof. 18 U.S.C. § 3663(a). Under the VWPA, the Court may also order restitution "to the extent agreed to by the parties in a plea agreement." 18 U.S.C. § 3663(a)(3). However, while the VWPA is permissive in nature, the Court is required to order restitution pursuant to the second such statute, the Mandatory Victims Restitution Act (hereinafter "MVRA"), in the following subset of cases:

> . . . all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense –

> (A) that is –
>
>> (i) a crime of violence, as defined in section 16;
>>
>> (ii) an offense against property under this title, or under section 416(a) of the Controlled Substances Act (21 U.S.C. 856(a)), including any offense committed by fraud or deceit;
>>
>> (ii) an offense described in section 1365 (relating to tampering with consumer products); and
>
> (B) in which an identifiable victim or victims has suffered a physical injury or pecuniary loss.

18 U.S.C. § 3663A(c)(1).

Whether based on the statutory authority in the VWPA or the MVRA, any order of restitution must be issued and enforced in accordance with the procedures set forth in 18 U.S.C. § 3664. *See* 18 U.S.C. §§ 3663(d), 3663A(d); *see also United States v. Harvey*, 532 F.3d 326, 339 (4th Cir. 2008); *United States v. Thompson*, No. 1:07-cr-00051, 2009 WL 331264, at *1 (W.D. Va. Feb. 10, 2009). Once it is determined that restitution is appropriate, the Court "shall order restitution to each victim in the *full amount of each victim's losses* as determined by the court and without consideration of the economic circumstances of the defendant." *Harvey*, 532 F.3d at 339 (quoting 18 U.S.C. § 3664(f)(1)(A)) (emphasis added in *Harvey*). This language has been interpreted to mean that restitution must be based upon "actual loss," rather than "intended loss," *Harvey*, 532 F.3d at 339, and it is the Government's burden to prove "actual loss" by a preponderance of the evidence, *see* 18 U.S.C. § 3664(e); *see also United States v. Mullins*, 971 F.2d 1138, 1147 (4th Cir. 1992).

III. DISCUSSION

A. Actual Loss

Whether the Court considers an award of restitution under VWPA or MVRA,[3] the facts of this case fall squarely within the Fourth Circuit's holding in *Harvey* on restitution, and accordingly, based upon the Government's evidence, restitution must be denied.

That case concerned a scheme whereby Harvey, a civilian employee with the United States Army Intelligence and Security Command (hereinafter "INSCOM") and Kronstein, a close friend of Harvey's and sole owner of Program Contract Services, Inc. (hereinafter "PCS") were convicted of aiding and abetting honest services wire fraud and bribery. *See Harvey*, 532 F.3d at 331. The Government established that Harvey engineered the award of a non-competitive, "sole-source" contract to PCS by falsely representing that "PCS had highly specialized personnel available to commence work immediately when, in fact, PCS lacked the minimum number of employees the contract required," and further falsely represented that PCS was the only firm qualified to perform the contract, when in fact there were approximately one hundred other viable alternatives in the immediate area. *Id.* Finally, and most pertinent to the case at hand, PCS had "employed individuals who lacked the requisite level of security clearance called for in the contract." *Id.* at 340. Ultimately, PCS received approximately $4.8 million in payments from INSCOM under this contract and renewal contracts. *Id.* at 331. The Government presented evidence that in exchange for Harvey's

---

[3] The Court assumes, *arguendo*, that the MVRA applies in this case as the Government contends. The Court is required to order restitution under the MVRA in all sentencing proceedings based upon a plea agreement that relates to a charge for "an offense against property under [Title 18] . . . including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii). Defendant pleaded guilty to Count One of the Indictment, which charged her with conspiracy to defraud a health benefit program, in violation of 18 U.S.C. § 1347, and to commit mail fraud, in violation of 18 U.S.C. § 1341, all in violation of 18 U.S.C. § 371 (docket nos. 1, 50). Accordingly, the statutory source of the Court's authority to impose restitution is the MVRA. *See Cohen*, 459 F.3d at 492, 498 (holding that the MVRA applies where defendant pleaded guilty to mail fraud in violation of 18 U.S.C. § 1341, and conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1347).

engineering the contract to PCS, "Kronstein funnelled earnings from PCS to Harvey via various family members and employees, primarily in the form of financial assistance to Johnny Appleseed, Harvey's restaurant." *Id.* at 332.

On appeal, the defendants challenged the Court's restitution order on the grounds that, *inter alia*, no actual loss to the Government could be calculated based upon the Government's evidence. *Id.* at 339. The Fourth Circuit agreed. While the Government had presented testimony that PCS "failed to comply with certain aspects of its contract, for example . . . employing individuals who lacked the requisite level of security clearance called for in the contract," the court held that "these violations may have seriously impaired PCS's performance of the contract, [but] they do not establish the amount of loss INSCOM actually suffered." *Id.* at 340. What would have been required in *Harvey*, and what the Government did not introduce into evidence, were "facts evincing either how INSCOM was injured by these contractual failures or, if so, in what amount." *Id.*

Here, like *Harvey*, the Government has presented no evidence tending to support the proposition that DMAS suffered any actual loss, much less supporting a calculation of actual loss.[4] It is undeniable that Advantage Care did not comply with the terms of its Provider's Contract with respect to the training of its PCAs. Further, it is undisputed that the figures in Attachment 1 to the Government's restitution memorandum accurately state the amounts billed to DMAS for services rendered by untrained PCAs. However, this does not satisfy the Government's burden of proof for purposes of proving an "actual loss" warranting an award of restitution. The evidence does not show

---

[4] Although the Court has made a finding for purposes of sentencing that this offense involved an intended loss exceeding $30,000 but less than $70,000, as calculated in the Presentence Report (citing U.S.S.G. § 2B1.1(b)(1)(D)), and although the Plea Agreement contained a provision stating that the Defendant acknowledges that "if this matter were to go to trial the United States could prove beyond a reasonable doubt that the intended loss caused by the conspiracy, in which [she] was a member, was between $30,000 and $70,000," Plea Agreement, at 3, these do not bear upon the Court's present inquiry because an order of restitution must be based on "actual loss," rather than "intended loss." *See Harvey*, 532 F.3d at 339 (citing cases).

that these untrained PCAs performed their duties in an unsatisfactory or substandard manner, nor does it show that the Government paid more for the services rendered by untrained PCAs than it would have had to pay for comparable services rendered by properly trained PCAs. Finally, it is uncontested that all Medicaid reimbursements were for medically necessary services, and that such services were actually rendered by employees (albeit not properly trained employees) of Advantage Care. The evidence before the Court provides no basis for concluding that the services actually rendered by the untrained PCAs was anything other than satisfactory.

The Government's attempts to distinguish *Harvey* can be summarized by its assertion that "[t]he evidence submitted by the government, which is unchallenged by the defendant, establishes that the Virginia Department of Medical Assistance Services would not have paid $130,157.00 in claims submitted by Advantage Care if DMAS had known the services represented by the claims had not been provided by properly trained and certified PCAs." Government's Memorandum in Support, at 6. This attempt to distinguish *Harvey* is unavailing. The Court can discern no reasonable argument for why a company's contractual failure to provide employees with the requisite level of security clearance (as in *Harvey*) should not satisfy the Government's burden of proof of "actual loss," while a company's contractual failure to provide employees with the proper level of training (as in the instant case) should satisfy its burden of proof. It does not take a great leap of faith to assume that INSCOM would not have made $4.8 million in payments to PCS had the agency been made aware of the defendants' wrongful conduct in that case.

Neither may the Court use the Defendant's gain as a proxy for calculating actual loss to the Government under 18 U.S.C. § 3664, as the Government suggested at the hearing on restitution. *See Harvey*, 532 F.3d at 340-41 (holding that "any order of restitution [ ] must be based on sufficient

evidence of the amount of actual loss incurred as a result of the fraudulently obtained contract. Profit gained by the defendants may not be used in its stead.").

Furthermore, there is ample persuasive authority outside the Fourth Circuit supporting the Court's denial of restitution on the Government's evidence. In *United States v. Razalan*, a case in which the defendants pleaded guilty to making false statements to a federal health care program in violation of 42 U.S.C. § 1320a-7b(a)(2)(ii),[5] the district court considered whether it had the authority to order restitution of the full amount defendants received in Medicaid reimbursements, where there was "no dispute that all amounts received in Medicare reimbursements were for medically necessary services that were in fact rendered by defendants." *United States v. Razalan*, No.08-cr-20668, 2010 WL 2232202, at *1 (E.D. Mich. May 26, 2010). The underlying criminal conduct for which restitution was sought in *Razalan* concerned false statements made to a federal health care program, regarding kickbacks paid by defendants Nancy Razalan and Generosa Agustin to a co-defendant Rebecca Sharp for referrals. In denying the Government's request for restitution for the full amount defendants received in Medicare reimbursements, the district court stated:

> There is no dispute that defendants performed all of the services for which they received reimbursement. There is no dispute that all of the services performed were medically necessary. There is no assertion of overcharging or hidden fees. In sum, the Medicare Trust Fund would have made the same payments if the defendants had not made any false statements. Without a discrepancy between the amount paid by the Medicare Trust Fund and the value of the services rendered, there can be no actual loss for the purposes of the Sentencing

---

[5] The court in *Razalan* noted at the outset that although the defendants had been indicted under 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(a)(2)(ii), they only pleaded guilty to the latter, *i.e.*, making a false statement to a federal health care program. Accordingly, because "[t]hey did not plead guilty to conspiring to defraud the United States or to paying kickbacks for referrals," the court found that it could not "order restitution as an independent sentence because it was not authorized by statute." *Razalan*, 2010 WL 2232202, at *3. However, because the court separately proceeded to analyze whether it could order restitution "if the government can identify a specific victim who suffered an actual loss," *id.* at *3, this Court still finds the cited portions of the *Razalan* opinion concerning whether the Government had proven "actual loss" to be applicable to the present circumstances.

>   Guidelines. Therefore, the government is not entitled to an order of
>   restitution under the Sentencing Guidelines.

*Razalan*, 2010 WL 2232202, at *3.

Similarly, in the present case, there is no evidence to suggest anything other than the fact that Advantage Care actually performed, and competently performed, the PCA services for which it sought reimbursement from DMAS, and that all such services performed were legitimate medical services. Had Advantage Care not performed the services identified by the Government in its Attachment 1 to its brief on restitution, DMAS would have had to reimburse another entity for the performance of such services, and there is no evidence in the record to suggest it would be at a different rate than that offered to Advantage Care. For the Court to accept the Government's position, and order restitution in the amount sought, it would have to believe that DMAS received no value for the work of Advantage Care.

## B. Effect of Plea Agreement

Finally, the Government appears to argue that restitution is warranted because the Plea Agreement includes the language: "I further understand that the United States will provide to the Court and recommend that I pay restitution to Medicaid for the loss caused by billing untrained Personal Care Aides at the Harrisonburg, Virginia office in 2004 and 2005." *See* Government's Memorandum in Support, at 4 ("Further, in the plea agreement, the United States and [Defendant] agreed the amount of restitution would be limited to the billing submitted for the untrained PCAs at the Harrisonburg, Virginia, office in 2004 and 2005.").

In its interpretation of a plea agreement, the Court "draw[s] upon contract law as a guide to ensure that each party receives the benefit of the bargain." *United States v. Jordan*, 509 F.3d 191, 195 (4th Cir. 2007). If the plea agreement "is unambiguous as a matter of law, and there is no evidence of governmental overreaching, [the Court] should interpret and enforce the agreement

– 11 –

accordingly." *Jordan*, 509 F.3d at 195 (citing *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986)). However, because a plea agreement implicates a defendant's fundamental and constitutional rights, the Court "analyze[s] a plea agreement with greater scrutiny than [it] would apply to a commercial contract," and it also holds the Government "to a greater degree of responsibility than the defendant . . . for imprecisions or ambiguities in plea agreements." *Jordan*, 509 F.3d at 195-96 (citing cases) (internal quotation marks omitted).

The plain and unambiguous language in the Plea Agreement provides that the parties simply agreed that the Government would put forward a recommendation to the Court that restitution be ordered "for the loss caused by billing untrained Personal Care Aides at the Harrisonburg, Virginia, office in 2004 and 2005." Furthermore, the Plea Agreement also provides that Defendant understood that "restitution *may* be ordered," and that she "*may* be required to pay restitution for the entire scope of [her] criminal conduct, including, but not limited to, all matters deemed as relevant conduct." Plea Agreement, at 1, 4 (emphases added). The parties clearly did not intend that Defendant would reimburse DMAS for amounts billed if, for example, the Court declined to order restitution, or found that it could not order restitution under the facts of the case.

Any order of restitution must be based upon sufficient evidence of the amount of actual loss that was caused by the defendant's wrongful conduct. *See Harvey*, 532 F.3d at 341. Having found that the Government has not met its burden of proof that DMAS has suffered any actual loss, the Court may not and does not order restitution.

IV. CONCLUSION

The Court's opinion today should not detract from the gravity of Defendant's illegal conduct, or minimize the potential for harm inherent in sending untrained and unqualified persons out to care for those in need of the services of a Personal Care Aide. The public interest has been protected by

the commencement of this criminal action against the Defendant, as well as by the sentence imposed by the Court. However, an award of restitution serves different purposes than the imposition of a criminal fine, and restitution requires that the Government prove an actual loss to an identifiable victim.

Having found that the Government has not met its burden of proof for the aforementioned reasons, the Court will DENY the Government's request for restitution, in an accompanying Order, to follow.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion and the accompanying Order to all counsel of record, to Defendant, and to Senior United States Probation Officer Lew Harmon.

Entered this 20th day of July, 2010.

_____
NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE